Good morning, Your Honor. I am Paul Eaglin from Fairbanks, Alaska, here to represent Ms. Conley. This arises from the District of Montana. As you can see from the briefing, the Commissioner and Ms. Conley differ greatly on the case that is of tremendous importance to her, Beneka v. Barnhart, so I hope to devote a lot of my time to that because of its importance to her. I have submitted a supplemental authority citing Forney v. Outfall from 1998 in support of that, and I'll try to develop that as we go along. Before I come back to the relationship of Forney v. Outfall and Beneka v. Barnhart, though, I would like to address the Commissioner's contention that in a Beneka type of situation, that a court may not grant more relief than asked for, or that Beneka somehow is limited, as I understood the argument, limited pretty much to its holding, and that the rest of it is dicta. Of course, we disagree with that. The way that we would see it is this. The relationship of Forney v. Outfall indicates that the Supreme Court has held that a litigant in a situation such as Beneka might get certain relief at district court and yet appeal seeking more. That was upheld in Forney v. Outfall. In order to do that, the part of the statute that seems to me, the only part of the statute that could authorize that would be the word modify in the statutory section that is of the greatest dispute between the Commissioner and Ms. Conley. It's the word that the Commissioner, it seems to me, read out of the statute in the briefing. The Commissioner quotes a substantial part of that statute, excuse me, 405G, but invariably leaves off the word modify, but that's the only support for the type of relief that you see in Forney v. Outfall. I think that also explains why the Commissioner relies so heavily on the notion and calls on this court to call for in-bank proceedings on the matter of whether a the credit as true rule or principle is viable or not. Counsel, before you get to the credit as true conundrum, you've got a whole host of findings against you that you've got to overcome before we can ever get to the credit as true ruling. So what mistakes did the ALJ make here? All right. Your Honor, Judge Biley, this, the argument that we're making is the one that I put forth in the brief, which is that Ms. Conley contends that the opinion of, the medical opinion of the treating rheumatologist, the specialist, was depreciated, not valued as it should have been valued by the ALJ, not correctly discounted in the way that is required by our precedents, such as, well, all the cases that we see cited in the briefing there. The precedents indicate that a treating specialist, such as Dr. Van Bolloy, is entitled to some weight, some considerable weight, more than what the ALJ did in this case. And to a great extent, the ALJ reflected a lack of appreciation of the specialty of rheumatology. I think what, let me put it this way, that cases such as Orne, for example, Orne versus Astrea, which is mentioned there in the briefing, and the other cases that are cited indicate that not only with respect to a treating physician entitled to greater weight, but when that treating physician is a specialist in rheumatology, the particular specialty that is applicable to fibromyalgia, to lupus. Let me cut to the chase for me, and I think this is an elaboration of what Judge Bybee was asking about. As I read the ALJ opinion, what's going on there is the ALJ is saying, okay, after I'm finished with all the fancy talk and looking at the medical reports and so on, the reports of activity by this claimant are such that I can't find disability. I'm getting over reports of disability from her, but I'm getting from the daughter that she's taking care of mom. My mom is taking care of my children in the morning. That was a reluctant witness. He had to kind of pull it out of her. She goes swimming for two hours, or rather she's at the river. She is walking her dog. She's doing a lot of things that are inconsistent with the level of disability that is being claimed. And, of course, we see a lot of these cases that is a fairly high level of sort of physical activity in order to get disability. I mean, that's where I am. The ALJ just says, you know, I just don't believe that the disability is as great as claimed, given the testimony I've got as to what she's been doing. So how do you respond to that? Well, Judge Fletcher, I would respond to that in the same way that or relying in part on the discussion in Oren versus Astru. That's a lovely opinion, by the way. I agree. Wholeheartedly. At about 631 and 632, where the court points out that there is no requirement that somebody be complete invalid. And so that would be the response. On the other hand, I would also point out that I'm no rheumatologist, and so I would have to rely on somebody such as Dr. Van Bolloy, who would take into account these kinds of activities, recommend certain types of activity. We have the whole debate about swimming and whether swimming works against Ms. Conley or whether it ought to be viewed as therapeutic under the circumstances.  I mean, there is some history at the Social Security Administration in dealing with questions of lupus and fibromyalgia. And lupus is a disease that is debilitating, but not in the way that other things are. She comments that when she goes swimming, she says, of course I'm covered up, which is typically what you do with lupus because you don't want exposure to the sun. But there are many people who suffer from lupus who are able to live very, very regular and ordinary lives and walk among us without any appearance of debility. So what, you know, the fact that you've got a rheumatologist saying, yes, she's got lupus and fibromyalgia, is not in and of itself evidence of a disability. Right. Well, Judge Bybee, in terms of how, of explaining this or that aspect, because I don't have that type of expertise, then I would not be able to address that. But I would say this, though, that to the extent that there is that kind of lack of clarity or any ambiguity or uncertainty, then the proper disposition would not be to deny the claim altogether, but to remand for further proceedings so that it will require the agency, for example, to ask Dr. Van Bolloy, the rheumatologist, these types of things. I don't have the expertise for that. And I would presume that the court does not, not this court, but the district court does not have that expertise either. Part of the ALJ's problem with Dr. Van Bolloy is that Dr. Van Bolloy offered an opinion that she was incapable of working after only seeing her once. So that's a pretty quick judgment. And if you're going to make a quick judgment on that, then there ought to be a pretty obvious disability. If you can see somebody once and say you clearly cannot work, then the disability ought to be apparent. And then you get back to Judge Fletcher's point. There was lots of evidence that she was engaging in substantial activities. I understand that, Judge Bybee. And I would say then that if that is the case, because there is also precedent, the courts do recognize that one would expect a specialist to be able to reach a diagnosis much quicker than a general practitioner. So I'm not surprised that Dr. Van Bolloy did not reach a conclusion that quickly. I don't know how quickly a specialist in rheumatology ought to be able to diagnose or not to diagnose lupus or fibromyalgia and so forth. I don't know what that would be because I don't have the expertise. The ALJ accepted the diagnosis. The diagnosis was not, the ALJ did not doubt. But what the ALJ said was Dr. Van Bolloy only saw her once, and the evidence is inconsistent with Dr. Van Bolloy's analysis, and much of Dr. Van Bolloy's analysis was based on Ms. Conley's own subjective history that she gave to Dr. Van Bolloy, and the ALJ says she's not credible. I understand that, Judge Biby, but what I would say is that a judge, a district court judge, or rather even an ALJ ought not to second-guess that type of opinion when you're dealing with a rheumatologist. They can call for a consultative examination. There are other ways to deal with that than to make this sort of dismissive remark such as happened here. Could I save my remaining half minute, please? Of course. Let's hear from the government, and we'll make sure you get a chance to respond. Good morning. May it please the Court, I am Pamela M. Wood for the Commissioner of Social Security. Just to briefly address Appellant's point with respect to Beneke. While Forney, even if Forney represents what he suggests, that the Court could have opened up its decision to reach the remaining issues of disability, they did not do so in this case. In fact, they expressly state, because the Commissioner did not object to the remand in itself, the sole issue before us is the remedy. Therefore, even if the Court in Beneke could have, it declined to. It did not. And I believe that is Appellant's difficulty in relying on Beneke. With respect to Dr. VanBelloy's opinions, as the Court has just noted, Dr. VanBelloy determined after one examination in May of 7 that Appellant could not work in two decisions in June of 7 and a decision in July of 7. She saw her one more time in February of 08 before issuing an opinion that she was unable to perform an 8-hour-a-day, 40-hour-a-week job. And again in October of 09, residual functional capacity assessment wherein she found significant functional limitations. The Commissioner's regulations emphasize the longitudinal aspect of a treating relationship. The longer a physician has seen a patient, is familiar with their condition and has treated that condition, the more weight their opinion is likely to carry. And that is the case here. There was not that longitudinal treating relationship. The ALJ expressly noted that. The ALJ also expressly noted that the objective medical findings of Dr. VanBelloy did not or were not consistent with her opinions, whether they were vocational or functional in nature. They were inconsistent with them. Now, she did find various tender points that are hallmarks of a diagnosis of fibromyalgia. But she also noted objective medical findings that relate more to the functional aspect of the individual with that disorder. In this case, by that I mean she noted only mildly reduced neck range of motion, normal back range of motion, normal shoulder range of motion, motor strength. These are things, again, that demonstrate, that go more to the functional aspect of the condition regardless of the diagnosis. And again, the ALJ expressly noted that these two things did not match in the case of Dr. VanBelloy. With respect to the subjective complaints, as, again, the Court has noted, an appellant engaged in not only the more mundane things like caring for herself and performing daily activities and driving a car and shopping, she instead of engaging in the more mundane things, she, in fact, engaged in child care anywhere at a minimum from several hours a day, several days a week. And if any of us have chased after children, we know that that constitutes some exertional and even non-exertional capabilities. With respect to the swimming, she, the ALJ expressly noted that this is simply inconsistent with Dr. VanBelloy's. How much evidence do we have on the question of the swimming? Because when I initially read that, I took that ALJ to say, well, she's swimming for two hours a day. That's substantial evidence. When I actually looked at it, it looked more like she was at the river. They had a river, a house on the river, and that she would go swimming, but she was at the beach for, on the river's edge, for two hours a day. Those are sort of two different things. Well. Two hours swimming is very different from being at the beach for two hours. Right. When she's stroking in the water for two hours, yes, that may be a little different than being at the river. So what does the record say? What does the record show? Well, the record says that this came about when the ALJ asked her what she did for recreation, not therapy, recreation. She says, we go down to the river a couple of hours a day in the summer. And, okay, she swims part of that time, yes. But even if she's in and out of the water, one suspects perhaps she was entertaining the children down there to some extent. Yeah, but all of that would be speculation. So what do we really, what does the record actually show? Does she go to the river frequently, oftentimes for two hours at a time, sometimes swimming? Correct. But if you're making a trip down to the river, you're staying a couple of hours in an area that is not necessarily conducive to easy. What river was this on? Sorry? Do you know which river it was? I'm sorry. I don't know which state it was in. Pardon? I wasn't even sure that it was in. She's in Montana. I wasn't even sure this was in Montana. Was it in Montana? It sounded to me like it was local, because she's, they would go daily during the summer. So in any event, a trip down to the river a couple of hours a day in itself. Well, a trip down to the river, it's unclear again. I'm trying to stick with the record here. A trip down to the river, she's at what she refers to as the river house. So the trip is to the river house, and it sounds as though when she's at the river house, the trip to the river is, no, they're at the river. And then she's asked, then would you go swimming in the river? Yes. And I would do leg exercise and arm exercise, but I wouldn't stay as long as I normally would. I'd go home. How long were you there on average? Maybe two hours. So the ALJ summarizes somewhat inaccurately to say she went swimming for two hours. No. Well. We know that she was at the river for a couple of hours a day on average, and she would sometimes swim. Correct, Your Honor. But regardless of that, an outing to the river a couple of hours a day, whether it is, you know, entirely swimming or it is a mix of swimming and sitting, suggests the ability to get out and do that sort of thing in an area that is not necessarily easy to get around in. I've got a somewhat different question. The ALJ held against her that she applied for unemployment benefits, and in her application stated that she was fully capable of working. Correct. But if you look at what happened to that, the Montana unemployment people deny her unemployment benefits because of her medical condition that she can't work. So the ALJ left that part out. So what am I to make of that? Well, Your Honor, I can tell you that she did initially apply for unemployment benefits, stating very expressly on the record, answering the question, is there any reason you cannot immediately perform a full-time job due to medical reasons? The answer was no. Now, she requested to change her claim to inability to work for medical reasons. And when the Montana – when the State of Montana redetermined that and looked at that again, here's what they said. The medical statement you provided shows the physician did not examine you until May 8, 07. That would be Dr. VanBeloy's first examination. One month after you left your employment. So like the ALJ, even the court in Montana had found inconsistencies. Where are you – what page are you reading from when you read that? That is transcript page 188 from the supplemental excerpt of records of the commissioner. I would also like to mention that the memo that appellant relies on, he misconstrues it to some extent. It does not – it says simply that receipt of unemployment benefits and receipt of disability benefits are not necessarily mutually exclusive. But it does – it does not mandate benefits under those circumstances either. In fact, it directs exactly as the ALJ did here. Okay. Which is to consider evidence along with the rest of the evidence in the record. And in fact – Okay. You're now over time. If you'd like to sum up? Thank you. Okay. Thank you. Did you allow me a moment to sum up? No, if you would like to. Yes, I said if you would like to sum up. Yes. Thank you. I will finish my sentence. In fact, it goes on to say that underlying circumstances may be more telling than the application itself. And that is exactly the case we have here. Thank you. Thank you. And you've saved some time. Yes, Judge Fletcher, with respect to what to make of a determination by another agency, it's one can't be sure under the circumstances. And that's part of the point of the memos that I attached to the reply brief, which is why the Chief Administrative Law Judge instructed ALJs not to hold against a claimant the types of statements. Even an application statement such as what she made, any reason why you can't work, people want to work. They'll work through pain. She's offering herself for employment is the context of that. And I believe it gets a bit distorted when it gets used against them in a way such as this. They're desperate. They want to feed themselves. They want to feed their family. That's what's going on with a response like that. In terms of the earlier questions to me, I believe that Dr. Van Beloy's estimation on the commissioner's record at 436, the which sets forth, I believe, the base fundamental record of what were the limitations of Miss Connelly based on her expertise as a specialist in the appropriate specialty field. The vocational expert opined, based on this as a hypothetical, that there was not work existing in the economy that Miss Connelly could do. And I believe that should be the appropriate basis for a decision in favor of Miss Connelly. Okay. Thank you. Thank you very much. The case of Connelly versus Astro is now submitted for decision. The last case in our argument calendar this morning.
judges: Fletcher, Fisher, Bybee